IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC., et al, <br><br> Plaintiffs, <br><br> v. <br><br> THE CITY OF NEW YORK, et al, <br><br> Defendants. | Case No.: 1:13-cv-02115-RWS |

**MEMORANDUM IN REPLY AND FURTHER SUPPORT
OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

COME NOW the Plaintiffs NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC.; ROMOLO COLANTONE; EFRAIN ALVAREZ; and JOSE ANTHONY IRRIZARRY, by and through counsel, and hereby set forth the following facts, reasons, and authorities in reply to defendants' opposition to, and in further support of, their motion for a preliminary injunction.

Dated: July 2, 2013

Respectfully Submitted,

GOLDBERG SEGALLA, LLP

By: /s/ Brian T. Stapleton
Brian T. Stapleton, Esq. (BS 5640)
Matthew S. Lerner. Esq. (ML 2020)
11 Martine Avenue, Suite 750
White Plains, New York 10606-1934
(914) 798-5400
bstapleton@goldbergsegalla.com

*Counsel For Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION & SUMMARY OF ARGUMENT..................................................................1

ARGUMENT......................................................................................................................................1

    I.      Plaintiffs Are Overwhelmingly Likely To Prevail On The Merits...............................1

           A.      38 RCNY § 5-23 Unduly Burdens Core Second Amendment Rights....................1

           B.      New York City's Restrictions On Target Practice And Competitive Shooting Violate Plaintiffs' First Amendment Rights................9

           C.      New York City's Restrictions On Target Practice And Competitive Shooting Violate Plaintiffs' Constitutional Right To Travel.................................................................................................................11

           D.      New York City's Restrictions On Target Practice And Competitive Shooting Violate The Dormant Commerce Clause..................13

    II.     The Irreparable Harm To Plaintiffs And The Public Interest Require This Court To Grant A Preliminary Injunction..................................................................15

CONCLUSION................................................................................................................................15

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10606
(914) 798-5400

# TABLE OF AUTHORITIES

**CASES**

*American Library Assoc. v. Pataki,*
969 F. Supp. 160, 174 (S.D.N.Y. 1997) ................................................................ 14

*Associated Indus. of Mo. v. Lohman,*
511 U.S. 641, 653 (1994) ...................................................................................... 14

*Bray v. City of New York,*
346 F. Supp. 2d 480, 488 (S.D.N.Y. 2004) .......................................................... 10

*City of Phila. v. New Jersey,*
437 U.S. 617, 626 (1978) ...................................................................................... 14

*District of Columbia v. Heller,*
554 U.S. 570, 617-18 (2008) .................................................................................. 2

*Ezell v. City of Chicago,*
651 F.3d 684, 706 (7th Cir. 2011) .......................................................................... 2

*Freedom Holdings Inc. v. Spitzer,*
357 F.3d 205, 216 (2d Cir. 2004) ......................................................................... 14

*Healy v. Beer Inst.,*
491 U.S. 324, 332 (1989) ...................................................................................... 14

*In re Kelley,*
225 A.D. 29, 32 (4th Dep't 1928) ........................................................................... 5

*McDonald v. City of Chicago,*
130 S. Ct. 3020, 3045 (2010) .................................................................................. 7

*NAACP v. Alabama,*
357 U.S. 449, 460 (1958) ...................................................................................... 10

*New Albany DVD, LLC v. City of New Albany,*
581 F.3d 556, 560 (7th Cir. 2009) ...................................................................... 5, 7

*Pi Lambda Fraternity, Inc. v. Univ. of Pittsburgh,*
229 F.3d 435, 443 (3d Cir. 2000) ......................................................................... 10

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10606
(914) 798-5400

# TABLE OF AUTHORITIES
(continued)

*Torraco v. Port Auth. of N.Y. & N.J.*,
615 F.3d 129 (2d Cir. 2010) ................................................................................................ 13

*United States v. Chester*,
628 F.3d 673 (4th Cir. 2010) ................................................................................................ 3

*United States v. Marzzarella*,
614 F.3d 85 (3d Cir. 2010) .................................................................................................... 3

*United States v. Oppedisano*,
2010 U.S. Dist. LEXIS 127094 (E.D.N.Y. Nov. 30, 2010) ................................................. 3

*United States v. Reese*,
627 F.3d 792 (10th Cir. 2010) .............................................................................................. 3

*United States v. Skoien*,
614 F.3d 638 (7th Cir. 2010) ................................................................................................ 3

## STATUTES

18 U.S.C. § 922 ........................................................................................................................ 3

N.Y. Penal Law § 265.20[13] .................................................................................................. 9

## RULES

38 RCNY 3-14 ......................................................................................................................... 5

38 RCNY 5-23 ................................................................................................................. passim

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10606
(914) 798-5400

## INTRODUCTION AND SUMMARY OF ARGUMENT

The City's limited view of constitutional rights is shocking. By the City's lights, the right to keep and bear arms is essentially a City-created right – not one pre-existing our founding and enshrined in the Second Amendment – that can be limited whenever and however the City desires. The City believes that it can restrict the freedom of association of its residents so long as some avenue for association remains. The City insists that the impact of its regulations beyond City borders is of no concern.

New York City should know better. The City is part of the State which is a component of a broader union fully protected by the Constitution. Simply put, the Constitution applies with the same force in New York City as it does everywhere else in the country. As a result, Plaintiffs are overwhelmingly likely to prevail on the merits in this case. The City's licensing restrictions unduly burden the right of City residents to keep and bear arms in their non-City homes and to train to effectively exercise their Second Amendment rights. 38 RCNY § 5-23 makes it impossible for New York City residents to freely associate with their preferred shooting clubs and to exercise their First Amendment right to teach and learn firearm proficiency. And the City's restrictions unconstitutionally limit the right to travel and impermissibly regulate commercial activity outside New York borders.

## ARGUMENT

I.  **Plaintiffs Are Overwhelmingly Likely To Prevail On The Merits**

   A.  **38 RCNY § 5-23 Unduly Burdens Core Second Amendment Rights**

As explained in Plaintiffs' moving papers, 38 RCNY § 5-23 ("the regulation") runs afoul of the Second Amendment in two fundamental ways: it effectively prohibits a New York City licensee

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10606
(914) 798-5400

1

from possessing a handgun in a second home and severely restricts licensees' ability to engage in target practice and participate in shooting competitions.

New York City's arguments to the contrary are unavailing. The City contends that preventing the transport of City-licensed firearms to second homes "simply does not present a Second Amendment problem" because a New York City license "is limited only to the specific premises for which it is issued." *See* defendants' Memorandum of Law at 6. The City misapprehends the nature of fundamental Second Amendment rights and their relationship to the City's licensing. It is the City's licensing program that must comply with the Second Amendment; not vice-versa. The Second Amendment and cases like *Heller* and *McDonald* mark the contours of the right to keep and bear arms, not the terms of the license issued by the City.

The City also argues that "target practice and competitive shooting do not fall within the ambits of rights protected by the Second Amendment." *See* defendants' Memorandum of Law at 5. But the City fails to cite a single case holding as much. Nor could it—*Heller* itself makes clear that the right to obtain and maintain firearm proficiency is part and parcel of the core Second Amendment right. *District of Columbia v. Heller*, 554 U.S. 570, 617-18 (2008) ("to bear arms implies something more than the mere keeping; it implies the learning to handle and use them in a way that makes those who keep them ready for their efficient use"); *see also Ezell v. City of Chicago*, 651 F.3d 684, 706 (7th Cir. 2011) (applying *Heller*).[1]

After begrudgingly acknowledging that Second Amendment rights are actually implicated by Plaintiffs' claims, the City contends that the burdens imposed by 38 RCNY § 5-23 survive

---

[1] The City criticizes Plaintiffs for "failing to establish that they have no ability to practice within New York City." *See* defendants' Memorandum of Law at 14. That criticism ignores the fact that the City "bears the burden of justifying its action under some heightened standard of judicial review," not the other way around. *Ezell v. City of Chicago*, 651 F.3d 684, 706 (7th Cir. 2011).

intermediate scrutiny due to the City's "substantial interest in public safety and crime prevention." *See* Defendants Memorandum of Law at 11. Not so.

In terms of controlling law, the City's contention that intermediate scrutiny applies in this case brazenly ignores *Heller*'s explicit and definitive rejection of the "interest-balancing" approach endorsed by Justice Breyer—which is simply intermediate scrutiny by another name. *See Heller*, 554 U.S. at 634; *McDonald*, 130 S. Ct. at 3050 (plurality op.) ("while [Justice Breyer's] opinion in *Heller* recommended an interest-balancing test, the Court specifically rejected that suggestion"). And the cases cited by the City in support of applying intermediate scrutiny are readily distinguishable. All of the City's cases involve challenges by non-law-abiding citizens to regulations limiting the right to concealed carry or federal criminal prosecutions for possession of a firearm in violation of 18 U.S.C. § 922.² But those cases are inapposite to this challenge by law-abiding, responsible citizens seeking to exercise core Second Amendment rights.

Where it does not ignore the law the City misstates it. *Kachalsky v County of Westchester*, 701 F.3d 81 (2d Cir. 2012), does not stand for the proposition that "a firearm in public presents a greater danger than the presence of a firearm inside one's home." *See* defendants' Memorandum of Law at 11. Rather, *Kachalsky* recognized that the State has traditionally had a greater ability to regulate public, as opposed to private, conduct. *Id.*, 701 F.3d at 94-99. Since the home has always been treated as a special place that is subject to only limited state regulation, the State's ability to regulate private firearm possession inside the home has been greatly circumscribed by the courts. *Id.*

---

² Three of the cases cited by Defendants involved domestic violence misdemeanants. *See United States v. Reese*, 627 F.3d 792 (10th Cir. 2010); *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010). *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), involved a firearm with the serial number illegally removed. Finally, *United States v. Oppedisano*, 2010 U.S. Dist. LEXIS 127094 (E.D.N.Y. Nov. 30, 2010), involved a convicted felon found to be in possession of ammunition and cocaine.

at 94. While plaintiffs do not agree with *Kachalsky*'s view that Second Amendment rights are entitled to reduced respect outside the home, it is important that *Kachalsky*'s holdings and rationale be, at the very least, articulated correctly.

In all events, the interests cited by the City cannot justify the restrictions it places on its licensees under any standard of scrutiny. The City provides no factual support for its sweeping generalization that prohibiting Premises Residence licensees ("licensees") from driving to an out-of-city or out-of-state range with their firearms reduces public danger, and its argument that its restrictions are necessary to prevent bouts of road rage from devolving into armed confrontations strains logic. Even if the Court credits the unlikely supposition that licensees are "just as susceptible as anyone else" to "stress-inducing circumstances" like road rage and traffic accidents (Lunetta Declaration at 2), the regulation does nothing to reduce or eliminate a licensee's exposure to such stressors. A simple example proves this point.

According to the regulation, a premises residence licensee living on the corner of 233rd Street and Kepler Avenue in Woodlawn (in the North Bronx) is free to drive with her firearm to any NYCPD-approved range she chooses, provided the range is within NYC borders and she is allowed into the range itself. She is not permitted to take her firearm from the Bronx into Yonkers (because Yonkers is in Westchester County and not New York City). Therefore, under the regulation the Woodlawn licensee cannot take target practice at the Coyne Park Rifle and Pistol Range (located at 771 McLean Avenue in Yonkers), even though this range is open to the public and approximately one mile away from her home.[3] Assuming the licensee is a member of the Richmond Boro Gun Club (an NYCPD-approved range located at 4775 Arthur Kill Road in Staten Island (*see* Exhibit E

---

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10606
(914) 798-5400

[3] http://www.coyneparkrange.net/index2.php

4

of Lunetta Declaration)), the licensee would be allowed to drive there with her firearm. The Richmond Boro Gun Club is at least forty one (41) miles away from Woodlawn. Under optimal New York City traffic conditions, the drive would take approximately one hour. If traveling within NYC limits during rush hour, the Woodlawn licensee would have to navigate extremely difficult traffic conditions (including the heavily congested Major Deegan Expressway, Tri-Boro Bridge, Brooklyn-Queens Expressway, and Verrazano Bridge) and her drive could take significantly longer than one hour. Under the challenged regulation, however, while the Woodlawn licensee can drive her firearm 41 miles from the Bronx to Staten Island, she cannot drive it a mile down the road to a shooting range in Yonkers.

Under any circumstances, New York City residents are legally required to transport firearms unloaded in a locked container in the trunk of their car. *See* 38 RCNY § 3-14, 38 RCNY § 5-23(a)(3),(4). There is no reason to believe that very many (or any) enraged drivers will jump out of their cars, run to the trunk, unlock their firearm and ammunition, and begin loading and firing in the span of a road rage incident in the absence of the City's travel restrictions. And the City cannot justify its restrictions based on a fear that licensees will fail to follow the City's rules on where firearms can be taken if transportation restrictions are lifted.[4]

The City's asserted interest in public safety is fatally undermined by its own arguments. One of the City's many flawed contentions is that the challenged regulation is necessary to prevent a Premise Residence license from being converted into a Conceal Carry license (Lunetta declaration at 2-3). This claim, however, deliberately ignores the essence of the plaintiffs' complaint: their rights to

---

[4] The City's contrary view conflicts with the well-established legal presumption that people ordinarily do not act unlawfully. *See In re Kelley*, 225 A.D. 29, 32 (4th Dep't 1928) ("An inference that one is moved by an improper or unlawful motive should never be drawn when a legitimate purpose is just as apparent."); 57 NY Jur Evidence and Witnesses § 144 ("irregularity of conduct or an infraction of law will not be presumed").

travel beyond NYC limits to practice, compete and defend second homes with their firearms have been violated.[5] No plaintiff is complaining that they've applied for, but have been wrongfully denied, a Conceal Carry permit. In this sense, Deputy Inspector Lunetta's assertion that plaintiffs "have not demonstrated proper cause to carry a concealed handgun in public" (Lunetta Declaration at 2) is not just factually incorrect and irrelevant, but a deliberate attempt to mislead the Court.

Another flawed City rationale is that 38 RCNY § 5-23 is unproblematic because Plaintiffs can obtain a license to possess firearms in jurisdictions outside the City. *See* Opp. 6. Apparently the City envisions a world where a City resident has a firearm in his New York City home, a second gun in his second home (if he has one), and a third gun stashed somewhere in the jurisdiction where he wants to participate in shooting competitions. Setting aside whether this scenario is legally permissible or logistically possible, the notion that this multiple-gun regime promotes public safety blinks reality.[6]

Relatedly, the State's contention that its severe restrictions on Second Amendment rights are necessary to make sure that licensees cannot claim they are going to a shooting range when they are really going elsewhere is premised upon a series of inaccurate presumptions that are unsupported by any facts. The first wrong-headed assumption is that all premise residence licensees will lie to the

---

[5] Defendants' argument that Plaintiffs' constitutional rights can simply be eliminated outside of the geographic area approved by Defendants has no legal basis. Defendants cite no precedent for this radical proposition. Indeed, when the City of Chicago raised a similar argument, it was soundly rejected:

> *This reasoning assumes that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction. That's a profoundly mistaken assumption. In the First Amendment context, the Supreme Court long ago made it clear that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." The same principle applies here.*

*Ezell*, 651 F.3d at 697 (*citing Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 76-77 (1981)). This Court should similarly reject Defendants' argument here.

[6] The City's argument on this score is particularly troubling in light of New York Penal Law § 400.00(5), which provides that "[t]he name and address of any person to whom an application for any license has been granted shall be a public record." It will not take a criminal mastermind to figure out what unoccupied homes have firearms in them.

police if stopped while carrying a firearm. (*See, e.g.,* Lunetta Declaration at 2-3 (allowing licensees to transport firearms anywhere makes it "too easy" for them to "create an explanation" about traveling to a distant target practice or competition; limiting target practice locations in NYC limits a licensee's ability to "create such a fiction")). Within his declaration, Deputy Inspector Lunetta spends several pages detailing the great investigatory lengths the Licensing Division goes to when vetting license applicants. (*See,* Lunetta Declaration from p.4, ¶ 8 to p.9, ¶ 23). Yet, he also asks the Court to accept that the very same individuals to whom the City has entrusted Premises Residence licenses will promptly violate them by carrying concealed firearms on their persons, and then lie about it to the police. No facts on the record permit the City to tar an entire class of individuals with such a broad brush.[7]

The second baseless assumption made by the City is that NYCPD officers have a superior ability to judge the credibility of a licensee compared to that of police officers anywhere else in the state or the country. *See* defendants' Memorandum of Law at 13. ("the Licensing Division has a better ability to investigate the credibility [of a licensee] when [an] incident is reported by another officer of the NYPD;" "…law enforcement officers outside of New York City may be less able to pursue the credibility of [licensees transporting firearms outside of NYC] because the licensee could easily choose from any number of distant ranges…"). There is no basis in fact – and the City has

---

[7] At its core, Defendants' claimed justification for the travel prohibition is that they must limit the rights of firearm owners to travel because Defendants speculate that some limited number of firearm owners could travel for an unlawful purpose. Whether this is true, however, is simply irrelevant: Defendants cannot outright eliminate the constitutional rights of all law-abiding citizens because some might abuse them. *Cf. McDonald v. City of Chicago*, 130 S. Ct. 3020, 3045 (2010) ("The right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications. . . . Municipal respondents cite no case in which we have refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications."). Indeed, courts have already rejected the idea that the government may ban constitutionally-protected activity because the existence of that activity could lead to abuses. *See, e.g., New Albany DVD, LLC v. City of New Albany*, 581 F.3d 556, 560 (7th Cir. 2009) ("Just as there is no hecklers' veto over speech, there is no "thieves' veto." The police must protect the readers from the hecklers or thieves, rather than ease their workload by forbidding the speech.").

not provided any – upon which this Court could possibly conclude that a non-NYCPD officer is less willing or less able to investigate a firearm license and make a credibility determination than any other police officer. Returning to our example of the Woodlawn licensee traveling to Staten Island illustrates this point.

Assume that our Woodlawn licensee is stopped by a NYCPD officer as she is driving to Staten Island, that she tells the officer she is driving to the Richmond Boro Gun Club to practice, and that she produces her firearm and Residence Premises license for the officer to inspect. It is reasonable to assume that the NYCPD officer will undertake certain investigatory steps to check out her claims: she will run a background check on the licensee to determine if the licensee has a criminal record, an Order of Protection, or any outstanding warrants; she will contact the licensing division to determine if the license has been suspended or revoked; she may contact the State Police or the FBI to see if the firearm has been legally purchased; and she might call the Richmond Boro Gun Club to see if the licensee is a member.

Assume now that, instead of driving through NYC on her way to the Richmond Boro Gun Club, the Woodlawn licensee decides to cross over the George Washington Bridge into New Jersey, drive south down the New Jersey Turnpike (aka I-95), and then cross over the Goethals Bridge into Staten Island. Assume further that she is stopped by a New Jersey State Trooper on the New Jersey Turnpike, and produces her firearm, license, and the same explanation about where she is headed.

The City has failed to make any showing that the New Jersey State Trooper in our example (or, indeed, any other police officer from any other jurisdiction) could not or would not take the very same investigatory steps as those taken by the NYCPD officer: conducting a background check,

contacting the NYC Licensing Division, contacting the NYS State Police or FBI, calling the Richmond Boro Gun Club, etc., etc.

According to the City's reasoning, the New Jersey State Trooper might not report the traffic stop to the Licensing Division since he is allegedly not required to. *See* defendants' Memorandum of Law at 13. However, the City's fear of non-reporting by a non-NYCPD officer is inherently speculative: simply because a non-NYCPD officer is not required to contact the Licensing Division doesn't mean he would not do so anyway.

More importantly, the City has failed to show precisely how members of the non-NYCPD law enforcement community are handicapped when making credibility determinations about licensees. The City argues that, since there are more ranges beyond NYC borders that can be included in a licensee's supposed deception, a licensee stopped outside of NYC will lie more convincingly to a non-NYC police officer. *See* Lunetta Declaration at p.3, ¶ 5. ("When target practice and shooting competitions are limited to locations in New York City the ability to create such a fiction is limited"). However, the prevalence of digital information communicated over wide-spread wireless networks (including networked computers mounted in police cruisers) easily defeats the notion that an NYCPD officer is somehow better situated than an officer located just across the Hudson River to figure out if a licensee is lying about driving to a gun range.

This contention is also undercut by State law. New York law allows non-residents participating in shooting competitions within the State to transport unloaded firearms in locked containers to shooting competitions provided that such non-residents travel "with a copy of the match program, match schedule or match registration card." *See* N.Y. Penal Law § 265.20[13]. There is no reason to believe that a similar regulation could not serve the City's ends.

### E. New York City's Restrictions On Target Practice And Competitive Shooting Violate Plaintiffs' First Amendment Rights

Consistent with its approach to Plaintiffs' Second Amendment claims, the City asserts that 38 RCNY § 5-23 does not actually implicate First Amendment rights. That view simply echoes the City's disdain for the Second Amendment and *Heller*.

As Plaintiffs explained in their Amended Complaint, the City's restrictions violate the First Amendment by severely constraining Plaintiffs' "right to receive education instruction in the use of firearms, including the right to receive the training recognized by the defendants as a prerequisite to owning firearms." *See* Amended Complaint at 16. The City ignores this language and does not even address the First Amendment right to teach, learn, and convey information that is unduly restricted by 38 RCNY § 5-23. As set forth in Plaintiffs' main submissions, the right to teach, learn, and convey information is inextricably intertwined with the right to bear arms. *Heller*, 554 U.S. at 619 (noting that there is "[n]o doubt[] a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, *and in due time teaches his sons to do the same*, exercises his individual right." (emphasis added)).

The City also ignores the fact that participating in shooting competitions constitutes expressive activity. *See Bray v. City of New York*, 346 F. Supp. 2d 480, 488 (S.D.N.Y. 2004) (citing *Pi Lambda Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 443 (3d Cir. 2000) ("The Supreme Court has cast a fairly wide net in its definition of what comprises expressive activity.")). Competitive shooting events like those held in Old Bridge, New Jersey, Simsbury, Connecticut, and Roslyn, New York promote marksmanship, proficiency in the use of firearms, and safety with firearm use. The events are regular meetings of like-minded individuals who are devoted to upholding the Second Amendment. *See NAACP v. Alabama*, 357 U.S. 449, 460 (1958) (noting that

freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of freedom of speech).

Deputy Inspector Lunetta is simply incorrect when he says there are four (4) New York City-approved ranges that hold regular shooting competitions and are open to the public. *See* Declaration of Christopher Shkreli, attached hereto as **"Exhibit A."** In truth, there is only one: the Westside Rifle & Pistol Range. *Id.* However, even assuming that Deputy Inspector Lunetta is correct, the severe restriction on Plaintiffs' First and Second Amendment rights cannot survive. A court would not hesitate to strike down a law limiting protests to three or four City parks. The result should be no different here.

> F.  **New York City's Restrictions On Target Practice And Competitive Shooting Violate Plaintiffs' Constitutional Right To Travel**

The City simply repeats the mistakes already discussed in arguing against Plaintiff's right to travel claim. The unspoken premise of the City's opposition is that firearm possession in New York City is a City-created right that can be regulated at the City's whim. *See* defendants' Memorandum of Law at 16 ("Plaintiffs point to nothing that requires New York City to allow its licensees to transport their restricted firearms to other states"). The City gets it backwards: the right to possess a firearm is a fundamental constitutional right, not a right created by the City. The City can impose limited restrictions on Second Amendment rights only to the extent those restrictions are consistent with the Constitution.

Perhaps by accident, the City acknowledges that 38 RCNY § 5-23's restrictions are directed at impeding intrastate and interstate travel. In opposing Plaintiffs' dormant Commerce Clause claim, the City states that its restrictions are justified by its interest in "ensuring that people are not traveling all over the state with their firearms, and are only traveling with them directly to the places

that have been approved by the" New York Police Department. *See* defendants' Memorandum of Law at 25. While the City is wrong about the justification, it is correct about the burden on travel effected by 38 RCNY § 5-23.

The City attempts to justify its restrictions by pointing to a private gun club—the Richmond Borough Gun Club ("RBGC") on Staten Island—which holds rifle and pistol matches. Opp. 16. The City also cites the Staten Island Sportsmen's Club ("SISC") as another viable option for plaintiffs to participate in competitive shooting. *See* Lunetta Declaration at p.14, ¶ 39. But these examples only underscore the violation of the right to travel effected by the City's restrictions. As the City concedes, SISC hold only trapshooting matches, *id.* at p.15, ¶ 43, which are unlike the matches Plaintiffs would attend in Connecticut, New Jersey, and Long Island but for 38 RCNY § 5-23. *See* Pls.' Compl. at 3-4. As a result, assuming RBGC has similar matches to those held in Connecticut, New Jersey, and Long Island, Plaintiffs have only one option to participate in such competitions within City borders, which clearly burdens the right to travel. The only thing stopping Plaintiffs Alvarez and Irizarry from traveling from the Bronx with their guns to shooting competitions in Long Island or Connecticut—which are substantially closer than RBGC—is 38 RCNY § 5-23.

Furthermore, the City's opposition and the Commanding Officer of the NYPD License Division's affidavit demonstrate that the City lacks the necessary compelling interest in limiting City residents from transporting their firearms to other parts of New York or to others states where those firearms may be lawfully used. As previously stated, the City claims that 38 RCNY § 5-23 serves the government interest in protecting the public safety by ensuring that people are not traveling all over the state with their firearms, and are only travelling with them directly to the places that have

been approved by the NYPD. *See* defendants' Memorandum of Law at 25. This claim rings hollow when juxtaposed with 38 RCNY § 5-23(a)(4), which allows City licensees to transport their firearms to authorized areas designated by the New York State Fish and Wildlife Law. Although the City attempts to justify 38 RCNY § 5-23(a)(4), its justification fails to explain how that subsection of the City's rule comports with its alleged interest.

The City's right to travel argument boils down to the contention that firearms should be treated as a breed apart from other articles in commerce. A court would not think twice about striking down a law that restricted the ability to carry golf clubs outside the City or across state lines or that said that you can only play golf at a City-approved City golf course. A law placing these restrictions on handguns should meet the same fate. Indeed, if anything, a court should be more skeptical of the law limiting firearms given the fundamental First and Second Amendment rights at stake.[8]

### G. New York City's Restrictions On Target Practice And Competitive Shooting Violate The Dormant Commerce Clause

New York City's restrictions on where City residents can take their licensed firearms also run afoul of the dormant Commerce Clause. The City's argument to the contrary is that 38 RCNY § 5-23 is not protectionist and that only laws that seek to accomplish economic protectionism pose

---

[8] As explained in Plaintiffs' moving papers, 38 RCNY § 5-23 also violates the Firearms Owners' Protection Act ("FOPA"). The City ignores FOPA's plain text and argues that *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129 (2d Cir. 2010), and *Beach v. Kelly*, 52 A.D.3d 436 (1st Dep't 2008), undermine Plaintiffs' claims. The City misunderstands the holdings and relevance of those cases. The City contends that *Torraco* held "that FOPA does not create a presumption that gun owners may travel interstate with their guns to places that do not permit unlicensed firearm possession, as long as the person complied with requirements that the firearm be transported unloaded in a case." Opp. 18. That is not what *Torraco* held, but, in any event, Plaintiffs have never argued that FOPA allows travel to places that "do not permit unlicensed firearm possession." And *Beach* merely held that a firearm owner could not transport a firearm on an airplane to attend an out-of-state convention. That decision had nothing to do with transportation outside of New York City for shooting practice or self-defense in a second home and, thus, it has no relevance here, either. Moreover, to the extent that *Beach* can be construed to reach as broad a proposition as argued by Defendants, *Beach* would conflict with *Heller*.

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10606
(914) 798-5400

13

Commerce Clause problems. The City is wrong on both counts.

First, 38 RCNY § 5-23 is protectionist. It forces residents to engage in target practice and participate in shooting competitions at New York City ranges and New York City ranges alone, effectively depriving all non-City ranges of customers from one the Nation's largest markets. The fact that 38 RCNY § 5-23 is styled a firearms regulation and not an economic regulation does not alter the analysis. The Supreme Court's "Commerce Clause jurisprudence is not so rigid as to be controlled by the form by which a State erects barriers to commerce." *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 201 (1994).[9]

Second, the prohibitions of the dormant Commerce Clause extend beyond mere economic protectionism. The Supreme Court has made clear that when a law "has the 'practical effect' of regulating commerce occurring wholly outside that State's borders [it] is invalid under the Commerce Clause." *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989). Regulations, like the one at issue here, that have "the practical effect of 'extraterritorial' control of commerce occurring entirely outside the boundaries of the" jurisdiction in question are "invalid per se." *Freedom Holdings Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004); *see also American Library Assoc. v. Pataki*, 969 F. Supp. 160, 174 (S.D.N.Y. 1997) ("the Commerce Clause precludes a state from enacting legislation that has the practical effect of exporting that state's domestic policies.").

Even if 38 RCNY § 5-23 were not *per se* invalid, it would fail under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), because the burden on interstate commerce is clearly excessive in relation to the putative local benefit. Ranges outside of New York City lose

---

[9] Moreover, the specific reason for a law's enactment does not impact the dormant Commerce Clause calculus. *See Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 653 (1994) ("a court need not inquire into the purpose or motivation behind a law to determine that in actuality it impermissibly discriminates against interstate commerce."); *City of Phila. v. New Jersey*, 437 U.S. 617, 626 (1978) (describing "legislative purpose [as] not relevant to the constitutional issue to be decided in this case.").

GOLDBERG SEGALLA, LLP
11 Martine Ave., 7th Floor
White Plains, NY 10606
(914) 798-5400

14

100% of their business from City residents, who are now limited to exercising firearms proficiency, if at all, at the few ranges in the City. The claimed local benefit is that the City can now prevent its residents from driving to firearm ranges or competitions outside of the City. While the City claims that this restriction furthers public safety, that contention ignores the fact that other existing laws effectively ensure that transportation of firearms is done safely.

### III. The Irreparable Harm To Plaintiffs And The Public Interest Require This Court To Grant A Preliminary Injunction.

As explained in Plaintiffs' moving papers, the violation of constitutional rights like that at issue here is a classic irreparable injury. *See Ligon v. City of New York*, 12 CIV. 2274 SAS, 2013 WL 628534 (S.D.N.Y. Feb. 14, 2013). While the City quarrels with the merits of Plaintiffs' claims, it cannot seriously contend that the violation the rights asserted would not constitute irreparable injury. And, in addition to the fact that the public interest is always served when constitutional rights are vindicated, prohibiting New York City from enforcing a rule that makes it harder—not easier—for City residents to practice safe and effective firearm use serves the public interest.

### CONCLUSION

For all these reasons, this Court should issue a preliminary injunction against enforcement of the provisions of the Act identified above.

Dated: July 2, 2013                     Respectfully Submitted,

                                        GOLDBERG SEGALLA, LLP

                                        By:   /s/   Brian T. Stapleton
                                        Brian T. Stapleton, Esq. (BS 5640)
                                        Matthew S. Lerner, Esq. (MS 2020)
                                        11 Martine Avenue, Suite 750
                                        White Plains, New York 10606-1934
                                        (914) 798-5400

## CERTIFICATION

I hereby certify that on July 2, 2013, a copy of the foregoing REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION was filed electronically and served by mail upon anyone unable to accept electronic filing. Notice of this filing was will be sent by e-mail to the parties described below by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

MICHAEL A. CARDOZO
Corporation Counsel of the City of New York
By Michelle Goldberg-Cahn, Esq. (MG 4490)
***Attorney for Defendants***
100 Church St., 5th Floor
New York, New York 10007
migoldbe@law.nyc.gov

By: /s/ Brian T. Stapleton
 Brian T. Stapleton, Esq. (BS 5640)