IN THE UNITED STATES DISTRICT COURT
 FOR THE SOUTHERN DISTRICT OF NEW YORK


NEW YORK STATE RIFLE AND PISTOL )
ASSOCIATION, INC., et al., )
 )
                 Plaintiffs, )     Case No.: 1:13-cv-2115-RWS
 )
    v. )
 )
THE CITY OF NEW YORK, et al., )
 )
                 Defendants. )
_____)


### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT and MOTION FOR PRELIMINARY INJUNCTION

**GOLDBERG SEGALLA, LLP**
Brian T. Stapleton, Esq. (BS 5640)
Christopher Bopst, Esq.
11 Martine Avenue, Suite 750
White Plains, New York 10606-1934
(914) 798-5400
bstapleton@goldbergsegalla.com
*Counsel For Plaintiffs*

1

## TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................................. 1

STATEMENT OF FACTS ........................................................................................................... 3

ARGUMENT ............................................................................................................................... 3

    A.      Summary Judgment Standard ..................................................................................... 3

    B.      38 RCNY § 5-23 Violates the Second Amendment by (1) Restricting A Licensee's Ability To Possess a Handgun in a Licensee's Second Home Beyond the Borders of New York City, and (2) Restricting a Licensee from Engaging in Target Practice and Participating in Shooting Competitions. ..................................................................... 4

          1.      38 RCNY § 5-23 Burdens the Core Right Identified In *Heller* and Is Thus Unconstitutional. ...................................................................... 7

                i. 38 RCNY § 5-23 Burdens the Core Right To Use Arms in Defense of Hearth and Home. .................................................................... 7

                ii. *Osterweil* Does Not Make 38 RCNY § 5-23 Constitutional. ........................ 9

                iii. 38 RCNY § 5-23 Burdens The Core Right To Perfect The Skills Necessary To Possess And Carry Weapons In Case Of Confrontation. .............. 11

                iv. Under The Holdings In *Heller* And *McDonald*, 38 RCNY § 5-23's Restrictions Are Unconstitutional. ...................................................... 14

                    a.      38 RCNY § 5-23 Fails Under Any Arguably Applicable Standard of Scrutiny. .................................................................. 14

    C.      New York City's Restrictions On Target Practice And Competitive Shooting Violate Plaintiffs' Constitutional Right To Travel And The Firearms Owners Protection Act. ............................................................................................................................ 21

    D.      New York City's Restrictions On Target Practice And Competitive Shooting Infringe Plaintiffs' First Amendment Rights. .......................................................................... 25

    E.      New York City's Restrictions On Target Practice And Competitive Shooting Violate The Dormant Commerce Clause. ................................................................................ 28

CONCLUSION ........................................................................................................................... 32

**Cases**

*Abood v. Detroit Bd. of Ed.*,
    431 U.S. 209 (1977)......................................................................................................27

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004)......................................................................................................15

*Att'y Gen. of N.Y. v. Soto-Lopez*,
    476 U.S. 898 (1986)......................................................................................................21

*Bates v. City of Little Rock*,
    361 U.S. 516 (1960)......................................................................................................26

*Beach v. Kelly*,
    52 A.D.3d 436 (1st Dep't 2008) .....................................................................................25

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
    476 U.S. 573 (1986)......................................................................................................29

*C & A Carbone v. Town of Clarkstown*,
    511 U.S. 383 (1994)..................................................................................................29, 30

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................................................4

*Clark v. Jeter*,
    486 U.S. 456 (1988)......................................................................................................14

*Cleveland Bd. of Educ. v. LaFleur*,
    414 U.S. 632 (1974)......................................................................................................16

*Dean Milk Co. v. City of Madison*,
    340 U.S. 349 (1951)..................................................................................................28, 30

*Dept. of Revenue of Ky. v. Davis*,
    553 U.S. 328 (2008)......................................................................................................29

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)............................................1, 2, 4, 7, 8, 11, 12, 13, 14, 15, 19, 20, 25, 27, 28

*Dunn v. Blumstein*,
    405 U.S. 330, 340-41 (1972) ..........................................................................................22

*Edwards v. California*,
    314 U.S. 160 (1941) ........................................................................................................21

*Emp't Div., Dep't of Human Res. Of Oregon v. Smith*,
    494 U.S. 872 (1990) ........................................................................................................12

*Eu v. S.F. Cnty. Democratic Cent. Comm.*,
    489 U.S. 214 (1989) ........................................................................................................15

*Ezell v. City of Chicago*,
    651 F.3d 684 (7th Cir. 2011) ...............................................................................11, 12, 13

*Frontiero v. Richardson*,
    411 U.S. 677 (1973) ........................................................................................................16

*Gibbons v. Ogden*,
    22 U.S. 1, 27 (1824) ........................................................................................................31

*Green Party of New York State v. New York State Bd. of Elections*,
    389 F.3d 411 (2d Cir. 2004) ............................................................................................26

*Grosjean v. American Press Co.*,
    297 U.S. 233 (1936) ........................................................................................................26

*Harman v. Forssenius*,
    380 U.S. 528, 540 (1965) ................................................................................................22

*Island Silver & Spice, Inc. v. Islamorada*,
    475 F.Supp.2d 1281 (S.D.Fla. 2007), *aff'd* 542 F.3d 844 (11th Cir. 2008) ...................29

*Kachalsky v. County of Winchester*,
    701 F.3d 81 (2d Cir. 2012)................................................................6, 7, 10, 12, 15, 20

*Keller v. State Bar of Cal.*,
    496 U.S. 1 (1990) ............................................................................................................27

*Keyishian v. Board of Regents*,
    385 U.S. 589 (1967) ........................................................................................................27

*King v. New Rochelle Municipal Housing Authority*,
    442 F.2d 646, 648 (2d Cir. 1971) ....................................................................................23

*Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*,
    274 F.3d 683 (2d Cir. 2001) ..............................................................................................4

*Lewis v. BT Investment Managers, Inc.*,
    447 U.S. 27 (1980) ..........................................................................................................29

*McCullen v. Coakley*,
2014 U.S. LEXIS 4499 (U.S. Sup. Ct. June 26, 2014) ...............................................17

*McDonald v. City of Chicago*,
130 S. Ct. 3020 (2010) ..........................................1, 2, 4, 7, 8, 12, 13, 14, 19, 20, 25

*Memorial Hospital v. Maricopa County*,
415 U.S. 250 (1974) ...............................................................................................16

*Metro Taxicab Bd. of Trade v. City of New York*,
615 F.3d 152, 156 (2d Cir. 2010) ..............................................................................4

*Moore v. Madigan*,
702 F.3d 933 (7th Cir. 2012) ....................................................................................5

*Murdock v. Commonwealth of Pennsylvania*,
319 U.S. 105 (1943) ...............................................................................................26

*New Energy Co. v. Limbach*,
486 U.S. 269 (1988); ..............................................................................................29

*Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*,
511 U.S. 93 (1994) .............................................................................................28, 29

*Osterweil v. Bartlett*,
21 N.Y.3d 580 (2013) ...........................................................................................9, 24

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
460 U.S. 37 (1983) .................................................................................................14

*Peruta v. County of San Diego*,
742 F.3d 1144 (9th Cir. 2014) ...................................................................................6

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) ...............................................................................................29

*Richmond Newspapers v. Virginia*,
448 U.S. 555 (1980) ...............................................................................................12

*Saenz v. Roe*,
526 U.S. 489 (1999) ...............................................................................................21

*Selevan v. New York Thruway Auth.*,
584 F.3d 82 (2d Cir. 2009) ......................................................................................28

*Sewell v. New York*,
182 A.D.2d 469 (1st Dept. 1992) .............................................................................19

*Shapiro v. Thompson*,
　394 U.S. 618 (1969) ..............................................................16, 23

*Sporhase v. Nebraska ex rel. Douglas*,
　458 U.S. 941 (1982) ...................................................................29

*Stanley v. Illinois*,
　405 U.S. 645 (1972) ...................................................................16

*Stern v. Trustees of Columbia Univ. in City of New York*,
　131 F.3d 305 (2d Cir. 1997) ..........................................................4

*Sweezy v. New Hampshire*,
　354 U.S. 234 (1957) ...................................................................27

*Toracco v. Port Auth. of N.Y. & N.J.*,
　615 F.3d 129 (2d Cir. 2010) ..........................................................24

*Ullman v. United States*,
　350 U.S. 422 (1956) ...................................................................14

*United States v. Carter*,
　669 F.3d 411 (4th Cir. 2012) .........................................................15

*United States v. Decastro*,
　682 F.3d 160 (2d Cir. 2012) ....................................................7, 12, 13

*United States v. Guest*,
　383 U.S. 745 (1966) ...................................................................21

*United States v. Masciandaro*,
　638 F.3d 458 (4th Cir. 2011) .........................................................14

*United States v. Playboy Entm't Grp., Inc.*,
　529 U.S. 803 (2000) ...................................................................15

*United States v. United Foods, Inc.*,
　533 U.S. 405 (2001) ...................................................................27

*Universal City Studios v. Corley*,
　273 F.3d 429 (2d Cir. 2001) ..........................................................27

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
　454 U.S. 464 (1982) ...................................................................14

*West Virginia Bd. of Ed. v. Barnette*,
　319 U.S. 624 (1943) ...................................................................27

*Wooley v. Maynard,*
  430 U.S. 705 (1977)................................................................................................................27

**Statutes**

38 RCNY § 5-23
  ................1, 2, 3, 4, 5, 7, 9, 11, 12, 13, 14, 15, 16, 17, 20, 21, 22, 23, 24, 25, 26, 27, 28, 30, 31, 32

Firearm Owners Protection Act, 18 U.S.C. § 926A....................................................3, 6, 10, 21, 24, 32

New York Penal Law section 400.00(2)(f)..............................................................................................6

State Fish and Wildlife Law. ............................................................................................................1, 18

**Other Authorities**

Bill of Rights....................................................................................................................................7, 14

Fed. R. Civ. P. 56..........................................................................................................................3, 4, 32

U.S. Constitution..................................................................................................................................2

U.S. Constitution, First Amendment.................................................................................3, 17, 25, 27, 28, 32

U.S. Constitution, Second Amendment .......1, 2, 4, 5, 7, 8, 9, 10, 11, 12, 13, 14, 19, 20, 22, 23, 28, 32

U.S. Constitution, Fourteenth Amendment .................................................................................7, 21

U.S. Constitution, Article I, § 8, Clause 3 .................................................................................28

U.S. Constitution, Article IV, § 2 .................................................................................................21

U.S. Constitution, Commerce Clause .......................................................................3, 28, 29, 31, 32

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Plaintiffs, The New York State Rifle & Pistol Association, Romolo Colantone, Efrain Alvarez, and Jose Anthony Irizarry, submit this memorandum of law in support of their cross-motion for summary judgment (filed concurrently) and their motion for preliminary injunction (Docket No. 23), and in opposition to defendants' cross-motion for summary judgment (Docket No. 33).[1]

The U.S. Supreme Court's decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008) marked a watershed moment in Second Amendment jurisprudence.  Resolving a question that had been the subject of ongoing debate for the better part of a century, the Court concluded that the text, structure, and history of the Second Amendment confirm that it "confer[s] an individual right to keep and bear arms." *Id.* at 595.  Two years later, the Court concluded, in *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), that this individual right is a fundamental one that applies with full force to the States.

These transformational rulings concerning the right to keep and bear arms have thus far been largely symbolic for law-abiding gun owners of New York City, who still must suffer a regulation that ignores the fundamental nature of Second Amendment rights.  38 RCNY § 5-23 strictly limits the ability of a licensee to transport his or her firearm:

> The possession of the handgun for protection is restricted to the inside of the premises which address is specified on the license.

38 RCNY § 5-23 (b).  This near-categorical ban on transporting firearms contains only two modest exceptions: a licensee may transport a handgun directly to and from either an authorized small arms range/shooting club or an authorized area designated by the New York State Fish and Wildlife Law.

This regulation, which was adopted before *Heller*, produces numerous incongruous and

---

[1]     In addition to the Cross-Motion for Summary Judgments that are being filed by both sets of parties in the case, there is also pending a Motion for Preliminary Injunction previously filed by Plaintiffs. (Docket No. 9).  The same reasons which justify the entry of summary judgment in favor of Plaintiffs also warrant the entry of a preliminary injunction.

constitutionally problematic results. First, an individual can be licensed to possess a firearm in a residence in New York City and a firearm outside the city, but cannot transport his or her firearm between these locations. Second, and relatedly, notwithstanding the U.S. Supreme Court's recognition of defense as one of the core purposes of the Second Amendment, the rule prohibits citizens from taking their handguns to bona fide residences beyond their primary residences, such as second residences in rural areas, for protection although it allows the same firearms to be transported for hunting purposes. Third, section 5-23 tacitly acknowledges the importance of maintaining proficiency in handgun use, but permits residents to transport their firearms only to a small number of locations within New York City for this purpose; they may not travel to neighboring municipalities or states to participate in shooting competitions or to go to target ranges.[2]

Though Defendants suggest otherwise, Plaintiffs do not challenge restrictions on where they are authorized to possess loaded weapons in public. Rather, plaintiffs challenge New York City's restrictions on where and under what circumstances a lawful and licensed owner of a firearm may transport that firearm under section 5-23. Those restrictions are inconsistent with numerous provisions of the U.S. Constitution. *First*, section 5-23 conflicts with the Second Amendment as interpreted by the Supreme Court in *Heller* and *McDonald*. By prohibiting licensed firearm owners from transporting their firearms between residences for no reason other than administrative convenience, the rule significantly infringes a licensee's Second Amendment right to keep and bear arms in the home. By the same token, section 5-23's restriction on target practice and competitive shooting outside New York City unconstitutionally burdens the core right to acquire and maintain proficiency in the use of arms. *Second*, New York City's almost complete prohibition on transporting handguns outside of City limits infringes on the fundamental right to intrastate and

---

[2]    The regulations do not contain an exception for transporting firearms for maintenance or repair, so owners of lawfully-possessed firearms that are in need of either of these services have the same limited options. There is also no exception for replacement or trade-in.

interstate travel and is irreconcilable with the Federal Firearm Owners Protection Act, 18 U.S.C. § 926A. *Third*, the City's restrictions run afoul of the First Amendment. By prohibiting licensed City residents from taking their handguns outside the City, 38 RCNY § 5-23 prevents gun owners from associating with the ranges and shooting competitions they prefer, and, in effect, forces residents to become members of private New York City gun clubs with which they may rather not be associated. The City's restriction also adversely impacts residents' First Amendment right to teach and learn about how to safely and effectively use a handgun. *Fourth*, because 38 RCNY § 5-23 has the practical effect of controlling activity occurring entirely outside New York City boundaries and imposes burdens on interstate commerce without creating commensurate local benefits, it violates the Dormant Commerce Clause.

For all these reasons, this Court should grant Plaintiffs' motion for summary judgment and enter an order preliminarily and permanently enjoining the Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing 38 RCNY § 5-23's prohibition from traveling beyond the borders of the City of New York to attend at a gun range, shooting competition, or to use a lawfully possessed and licensed firearm for the purposes of defending one's home, person, and/or property.

## STATEMENT OF FACTS

The relevant facts of this matter are contained in Plaintiffs' Local Rule 56.1(a) Statement of Uncontested Material Facts that accompanies this Memorandum, Plaintiffs' Local Rule 56.1(b) Response to Defendants' Statement of Uncontested Material Facts and in the affidavits and exhibits attached thereto.

## ARGUMENT

### A. Summary Judgment Standard

Summary judgment is warranted upon a showing "that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is on the moving party to establish the absence of any material factual issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997). The Second Circuit will affirm a grant of summary judgment where the movant establishes a set of facts in support of his claim, which would entitle him to relief. *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 685 (2d Cir. 2001).[3]

**B. 38 RCNY § 5-23 Violates the Second Amendment by (1) Restricting A Licensee's Ability To Possess a Handgun in a Licensee's Second Home Beyond the Borders of New York City, and (2) Restricting a Licensee from Engaging in Target Practice and Participating in Shooting Competitions.**

The Second Amendment to the U.S. Constitution provides:

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend II. Following years of uncertainty about the scope of this amendment, in 2008 the Supreme Court held that the amendment protects the individual right to keep and bear arms in the home and for self-defense. *District of Columbia v. Heller*, 554 U.S. 570 (2008). Two years later, the Court concluded that the Second Amendment right recognized in *Heller* was a fundamental right that was fully applicable to the States. *McDonald v. Chicago*, 130 S. Ct. 3020, 3050 (2010).

Notwithstanding the sea change brought about by these decisions, New York City continues

---

[3]    Plaintiffs' motion for preliminary injunction, which remains pending, was fully briefed before the case was stayed. In that motion, the standard for entry of such a motion were discussed. See Docket No. 10, pp. 7-8. By way of brief recapitulation, in order to justify a preliminary injunction, a movant must demonstrate: 1) irreparable harm absent injunctive relief; 2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and 3) that the public's interest weighs in favor of granting an injunction. *Metro Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (internal quotation marks and citations omitted).

to adhere to a licensing scheme that unconstitutionally restricts the rights of its residents to keep and bear arms in defense of themselves and their families where they need these protections the most--in their homes. By prohibiting residents from transporting their licensed handguns beyond city borders, 38 RCNY § 5-23 significantly burdens the right of those residents who own a second home outside of the city to protect themselves, their families, and their property with a licensed handgun. As the rule at issue in this case directly implicates the "core purpose" of self defense within the home, it differs markedly from those restrictions which have been upheld as valid regulations. *See* Defendants' Memorandum of Law, p. 5-6 (citing cases that do not involve restrictions impacting the defense of one's home).

Defendants' application of the premises residence license operates as a substantial burden on the ability of law-abiding citizens to possess and use firearms for self-defense in their homes. Whether a primary residence or a second home, an individual has a critical interest in self-protection, and that interest may be even greater in a second home. As is the case with Plaintiff Colantone, second homes are often more rural, and the fact that such homes are not constantly inhabited can make them attractive targets for criminal activity. The subject regulation effectively limits firearms owners like Plaintiff Colantone who go through the rigorous application process and receive a Premises Residence License from being able to take an <u>unloaded</u> firearm between homes in multiple jurisdictions in which they are licensed.

Defendants misleadingly try to portray this as a "carry" case, arguing that the Plaintiffs are trying to convert a premises license into a carry license. Defendants, however, ignore the critical differences between "carrying" a firearm and "transporting" one. In the Second Amendment context, the right to "carry" a firearm concerns the right to maintain that firearm on one's person outside the home for purposes of self-defense. *See, e.g.*, *Moore v. Madigan*, 702 F.3d 933, 935 (7th

Cir. 2012); *Peruta v. County of San Diego*, 742 F.3d 1144, 1148-49 (9th Cir. 2014). "Transporting" a firearm is fundamentally different. Federal law a person to "transport" a firearm under certain conditions through states in which they are not licensed to carry it. *See* Firearm Owners Protection Act ("FOPA"), 18 U.S.C. § 926A (discussing transportation of firearms under federal law). Even the challenged regulation contains certain exceptions for "transporting" firearms, showing that Defendants are aware of the distinctions between these two concepts and that a regulation can allow transport of a firearm under certain conditions without affording full carry rights.

Defendants also misapprehend the nature of the relief Plaintiffs seek. Defendants contend that Plaintiffs want to be able to "travel unrestricted with their firearms throughout the state (or outside of New York State)." *See* Defendants' Memorandum of Law, p. 19. Not so. Unlike *Kachalsky*, which challenged the "proper cause" requirement for issuance of a concealed carry license,[4] Plaintiffs are neither claiming an entitlement to a concealed carry license nor seeking the functional equivalent of one.[5] A concealed carry license allows a holder to possess a firearm loaded with ammunition anyplace where it is not otherwise prohibited. The relief sought by Plaintiffs would not allow premises residence licensees such as Colantone unchecked ability to travel anywhere with loaded firearms. Instead, the relief would afford constitutional protection to limited transportation of unloaded firearms for certain purposes that are necessary for the full exercise of one's constitutional rights to defend their hearth and home, whether within the borders of New York City or outside of them.

---

[4]   See New York Penal Law section 400.00(2)(f).

[5]   Plaintiffs have not styled this action as a challenge to the concealed carry permit requirements, and they are not claiming that they have been improperly denied concealed carry permits. Rather, this lawsuit is a challenge to the constitutionality of the premises residence license's restrictions on licensee's ability to transport firearms for self protection from one home to another home and to sharpen their handgun skills to better be able to defend those homes.

1. **38 RCNY § 5-23 Burdens the Core Right Identified In *Heller* and Is Thus Unconstitutional.**

As the Second Circuit has recognized, "[i]n *Heller*, the Supreme Court concluded that the Second Amendment codifies a pre-existing 'individual right to possess and carry weapons in case of confrontation." *Kachalsky v. County of Winchester*, 701 F.3d 81, 88 (2d Cir. 2012) (quoting *Heller*, 554 U.S. at 592). That right was "fundamental to the newly formed system of government" at the Founding, *McDonald*, 130 S. Ct. at 3037, and is "fundamental to our scheme of ordered liberty," *United States v. Decastro*, 682 F.3d 160, 167 (2d Cir. 2012). *See McDonald*, 130 S. Ct. at 3042 ("[T]he Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty."); *id.* at 3041 ("Evidence from the period immediately following the ratification of the Fourteenth Amendment only confirms that the right to keep and bear arms was considered fundamental."); *id.* at 3037 ("The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights."); *id.* at 3040 (39th Congress' "efforts to safeguard the right to keep and bear arms demonstrate that the right was still recognized to be fundamental"); *Id.* at 3041 ("In debating the Fourteenth Amendment, the 39th Congress referred to the right to keep and bear arms as a fundamental right deserving of protection.").

i. **38 RCNY § 5-23 Burdens the Core Right To Use Arms in Defense of Hearth and Home.**

38 RCNY § 5-23's restrictions cannot be squared with *Heller*. *Heller* held that the District of Columbia's ban on handgun possession in the home violated the Second Amendment. *Heller*, 554 U.S. at 635. In so doing, the Court stated that the Second Amendment "guarantee[s] the individual right to possess … weapons in case of confrontation," and that the core purpose of the right is to allow "law-abiding, responsible citizens to use arms in defense of hearth and home" where the need for self-defense "is most acute." *Id.* at 592, 628, 635. "[H]andguns are the most popular weapon

chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629.

Aside from treating a right that the Framers believed vital enough to be ensconced in the nation's governing charter like a government-granted privilege such as driving a car or borrowing books from the public library, the rule makes it impossible for New York City residents with a second home beyond the borders of New York City, like Romolo Colantone, to use handguns "for the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home." *Heller*, 554 U.S. at 636; *see McDonald*, 130 S. Ct. at 3044 ("[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."); *id.* at 3048 (The right to keep and bear arms is "valued because the possession of firearms [i]s thought to be essential for self-defense."). If New York City residents are unable to transport their handguns to their second homes outside of New York City they, in turn, will be unable to use them for self-defense in their second homes.

There is no reason to think that Mr. Colantone has any less of a need to protect himself, his family, and his property at his second home. An individual living part-time in a home has no less need for self-protection and may in fact have an even greater need. Second homes are often more rural, and the fact that such homes are not constantly inhabited can make them attractive targets for criminal activity. Plaintiff Colantone's second home is in a town that does not even have its own police department. Given the relative lack of police presence in the area of Plaintiff Colantone's second home, it is critically important that he be able to respond in the event that criminal activity arises.

## ii. *Osterweil* Does Not Make 38 RCNY § 5-23 Constitutional.

Essential to the exercise of a person's right to keep and bear arms to defend his or her home is the ability to physically get a firearm to his or her home. Section 5-23 effectively prohibits a firearm owner with a premises license from transporting that firearm from one residence to another. This is an unconstitutional infringement upon the right of citizens to exercise their Second Amendment rights in their homes.

Defendants rely on the recent New York Court of Appeals decision in *Osterweil v. Bartlett*, 21 N.Y.3d 580, 999 N.E.2d 516 (2013) to attempt to refute this point. *Osterweil* held that New York's Penal Law does not prohibit an individual who owns a part-time residence in New York but makes his permanent domicile in another state from applying for a New York handgun license. *Id.* at 586-87. Defendants assert that the ability of an individual to obtain licenses in multiple jurisdictions somehow negates Plaintiffs' constitutional argument because it allows New York State residents to obtain handgun licenses in jurisdictions in which they have residences other than their primary residences.[6] Thus, Defendants' newly-minted constitutional solution to the problem of multiple residences is that a person who wants to be protected at each residence should keep a firearm at each residence.

The reliance by Defendants on *Osterweil* underscores the untenable nature of their position and their professed "solution" is entirely inimical to the Second Amendment and to Defendants' stated interest in public safety and crime prevention. *Osterweil* permits an individual to obtain a premises residence license in New York City and another handgun license outside of the city. Notwithstanding the fact that this individual has satisfied two separate licensing authorities of his or

---

[6] In support of their position, Defendants rely heavily on dicta in the Court's decision staying this case pending a decision from the New York Court of Appeals in *Osterweil*. *See* Defendants' Memorandum of Law, pp. 7-8. The statements of the Court were in no way a binding decision and were made without either the benefit of the *Osterweil* opinion or any briefing on the effect of the opinion on the case at bar.

her fitness for such licenses, he or she cannot transport a firearm <u>under any conditions</u> from one house to the other.  He or she could legally transport the firearm to a hunting facility hundreds of miles away, but would be violating his or her license by transporting the firearm between one home in the City to another home in Westchester County, both of which are places at which Second Amendment guarantees are "at their zenith." *Kachalsky*, 701 F.3d at 89.  Among other things, Defendant's one-gun-per-home policy would effectively double (and for some individuals triple or even quadruple) the cost of exercising the core Second Amendment right as it necessitates the purchase, registration, and maintenance of multiple firearms.  Moreover, having unattended firearms in multiple locations that often remain vacant for months at a time is much more detrimental to public safety and crime prevention than allowing an individual who has been licensed multiple times to transport a firearm safely and under limited conditions between homes in different jurisdictions.

In their moving papers, Defendants express a fear that residents of New York City who are allowed to transport their guns may resort to them in times of stress.  *See* Declaration of Andrew Lunetta, ¶ 2.  As an initial matter, Defendants' efforts to rely on this purported interest are critically undermined by Congress' enactment of the Firearm Owners Protection Act ("FOPA"), 18 U.S.C. § 926A, which specifically authorizes individuals to take a firearm from one location where they are authorized to possess it to a second location where they are authorized to do so.  Moreover, to the extent there is any such risk at all, the approach endorsed by Defendants—leaving firearms in homes that are unoccupied for extended periods of time—has little to recommend it.  Leaving a gun in a vacant house can easily turn a burglar who is already engaged in criminal activity into an armed burglar.[7]  Along the same lines, Defendants' stated goals of monitoring and controlling firearms are

---

[7]    In their Memorandum of Law, Defendants cite *Kachalsky* as support for the statement that "firearms in the public present a greater public danger than firearms inside one's home."  Defendants' Memorandum of Law, p. 13.  While *Kachalsky* did discuss the unique position of the home in constitutional law and the government interests in regulating firearms in different places, there was no holding in that case that firearms were comparatively more dangerous in one

much better served by allowing licensed individuals to have an understanding of the whereabouts of their licensed handguns rather than leaving them unattended for months as Defendants would suggest.  From the perspective of the law abiding gun owner, Defendants' alternative is more expensive as it requires the purchase and maintenance of multiple firearms, more dangerous as it entails leaving firearms at a residence that may be vacant for weeks or months at a time, and unconstitutionally burdens the right of New York City residents to keep and bear arms in their second residences.

### iii.    38 RCNY § 5-23 Burdens The Core Right To Perfect The Skills Necessary To Possess And Carry Weapons In Case Of Confrontation.

The right to perfect the skills necessary to "possess and carry weapons in case of confrontation" is part and parcel of the fundamental right to keep and bear arms.  As the *Heller* Court made clear, "'to bear arms implies something more than the mere keeping; it implies the learning to handle and use them . . .; it implies the right to meet for voluntary discipline in arms, observing in doing so the public order.'"  *Heller*, 554 U.S. at 616.  Indeed, there is "'[n]o doubt[] a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right.'"  *Id*. at 619.  As one circuit court has held:

> The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective.

*Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011). Because 38 RCNY § 5-23 effectively prohibits the full and effective exercise of the right to keep and bear arms, it runs afoul of the Second Amendment.

Even if the rights to learn to use and handle arms are not among the "core" rights protected

---

location or the other.  Moreover, a firearm in a vacant home can unknowingly fall in the hands of a criminal, child, incompetent person or other individual who would not otherwise be eligible to possess such a firearm.

by the Second Amendment, see *Kachalsky*, 701 F.3d at 84, *Decastro*, 682 F.3d at 165-166, at the very least, those rights are necessary to effectively exercise the right to bear arms and thus should be afforded the same protection. The Supreme Court "has acknowledged that certain unarticulated rights are implicit in enumerated guarantees," and certain "fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579-80 (1980). Thus the protective ambit that attaches to a fundamental right necessarily includes the protection of activities necessary to effectually exercise that right. *Cf. Emp't Div., Dep't of Human Res. Of Oregon v. Smith*, 494 U.S. 872, 877-78 (1990). So it is here. The right to keep and bear arms necessarily includes the right to engage in the activities to enable one to exercise that right effectively: target practice and shooting competitions.[8] 38 RCNY § 5-23 abridges that right and is unconstitutional.

The Seventh Circuit's decision in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), quoted above, is instructive. Just four days after *McDonald* was decided, Chicago passed an ordinance mandating one hour of range training as a prerequisite to lawful gun ownership. *Id.* at 689-90. The same ordinance, however, prohibited the operation of firing ranges within the city. *Id.* at 690. In holding that the plaintiffs in that case were entitled to a preliminary injunction against enforcement of the ordinance, the Seventh Circuit recognized that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." *Id.* at 704. Preventing individuals "from engaging in target practice" was "a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core

---

[8]  To the extent that one were to view the right at stake in this case as a right to bear arms for purposes of recreation, that right would still be fundamental. As the dissenters in *Heller* recognized, the majority secured a right to keep and bear arms for "self-defense, *recreation*, and other lawful purposes." *Heller*, 554 U.S. at 677 n.38 (Stevens, J., dissenting) (emphasis added); *id.* at 684 (Breyer, J., dissenting).

right to possess firearms for self-defense." *Id.* at 708.[9]

To be sure, the Second Circuit has identified 18th century laws that regulated the "time, place and manner for the discharge of firearms (as on public streets and taverns or on New Year's Eve)," and concluded that such "laws did not much burden self-defense and had a minimal deterrent effect on the exercise of Second Amendment rights." *Decastro*, 682 F.3d at 160. But the fact that those laws might have been permissible under the Second Amendment only underscores the constitutional problems with 38 RCNY § 5-23. Rather than granting sweeping permission followed by a list of exceptions, the rule categorically prohibits removing the firearm from the licensed premises (which necessarily precludes engaging in target practice or participating in shooting competitions) and then makes an exception for specifically approved ranges located in New York City. The only way that a New York City resident can legally engage in target practice (without successfully obtaining membership in a private club and paying the associated fees) is by reserving a timeslot at the one publicly available range in the entire city, which he or she may be unable to do. *See Decastro*, 683 F.3d at 160 (noting that *Heller* and *McDonald* "emphasized the practical impact of a challenged regulation on the ability of citizens to possess and use guns for the core lawful purpose of self-defense").

The safe, responsible, and meaningful exercise of the Second Amendment right by an individual requires unrestricted access to gun ranges and shooting events in order to practice and perfect safe gun handling skills. 38 RCNY § 5-23 infringes city residents' exercise of the Second Amendment right to keep and bear arms by completely prohibiting residents from practicing safe gun handling at a target range or shooting event that is located beyond the borders of New York City. Given the limited availability of such ranges and events in New York City, the challenged

---

[9]    Notably, the Second Circuit cited *Ezell* as persuasive authority in *United States v. Decastro*, 682 F.3d at 166, 167, *supra*.

regulation effectively prohibits New York City residents from honing the skills necessary to defend hearth and home altogether. Indeed, 38 RCNY § 5-23 impedes gun ownership itself by unreasonably limiting, and effectively barring, access to useful information and experiences that are necessary to the exercise of Second Amendment rights.

### iv. Under The Holdings In *Heller* And *McDonald*, 38 RCNY § 5-23's Restrictions Are Unconstitutional.

Because of the severity and nature of 38 RCNY § 5-23's restrictions on the Second Amendment right, it is squarely unconstitutional under *Heller* and *McDonald*. The only way to avoid invalidating 38 RCNY § 5-23 on Second Amendment grounds would be to conclude that the right to keep and bear arms is less fundamental than other fundamental rights. But the Supreme Court has stressed that it is improper to prefer certain enumerated constitutional rights while relegating others to a lower plane: No constitutional right is "less 'fundamental' than" another, and there is "no principled basis on which to create a hierarchy of constitutional values . . . ." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982); *accord Ullman v. United States*, 350 U.S. 422, 428–29 (1956) ("To view a particular provision of the Bill of Rights with disfavor inevitably results in a constricted application of it. This is to disrespect the Constitution."). That is particularly true of Second Amendment rights, which are no less worthy of respect than any other fundamental right. *See McDonald*, 130 S. Ct. at 3044 (there is no basis for "treat[ing] the right recognized in *Heller* as a second-class right").

### a. 38 RCNY § 5-23 Fails Under Any Arguably Applicable Standard of Scrutiny.

When government action impinges upon a fundamental right protected by the Constitution— as it does here—strict scrutiny applies. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983); *see Clark v. Jeter*, 486 U.S. 456, 461 (1988) ("[C]lassifications affecting fundamental rights are given the most exacting scrutiny."); *United States v. Masciandaro*, 638 F.3d 458, 470 (4th

Cir. 2011) ("As we observe that any law regulating the content of speech is subject to strict scrutiny, . . . we assume that any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny."); *United States v. Carter*, 669 F.3d 411, 416 (4th Cir. 2012) ("[W]e have noted that the application of strict scrutiny is important to protect the core right of self-defense identified in *Heller*....").

Under strict scrutiny, a law infringing a constitutional right must be narrowly tailored to serve a compelling government interest. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). To be narrowly tailored, a law must actually advance the compelling interest it is designed to serve, and be the least restrictive means of achieving that advancement. *See Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 226 (1989); *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). When applying strict scrutiny, the challenged law is presumed invalid, and the government bears the burden of rebutting that presumption. *Playboy Entm't Grp.*, 529 U.S. at 817.

38 RCNY § 5-23, which prohibits premises residence licensees in New York City from transporting their licensed handguns beyond the borders of the city to use for self-protection in a second home or for practice at target ranges or recreational or competitive shooting events, fails to satisfy any of the elements of strict scrutiny. The Second Circuit has recognized that the State of "New York has [a] substantial, indeed compelling, governmental interest[] in public safety and crime prevention." *Kachalsky*, 701 F.3d at 97. New York City surely has that same interest. But this interest is not served or advanced by an overly broad law that makes it (1) impossible for New York City residents to use their handguns for self-defense in their second homes, and (2) difficult (or impossible) to practice the safe and effective use of a handgun. Were the city acting in pursuit of its interests in public safety or crime prevention, it would allow a licensee who owns a second home outside of city limits to transport his or her handgun to that home for purposes of self-protection.

The fact that the rule carves out a hunting exception shows that the city has subordinated the core value of protection of one's home, property and family to the pastime of recreational hunting. Furthermore, if the City were acting in pursuit of its interests in public safety or crime prevention, it would make it easier, rather than harder, to engage in target practice and competitive range shooting. 38 RCNY § 5-23 does not advance the compelling interest it is purportedly designed to serve.

Although Defendants rely on the above-cited case law for the principle that public safety and crime protection are legitimate state interests, see Defendants' Memorandum of Law, pp. 12-13, the evidence submitted by Defendants to justify the rule show that its primary purpose is administrative convenience and internal consistency. The Statement of Basis and Purpose published at the time the regulation was issued states that the 2001 amendments were done "in the interest of consistency, fairness and efficiency." Declaration of Michelle Goldberg-Cahn, Ex. B. The statement further provides that the relevant chapters "have been amended to be internally consistent in application, renewal, and suspension/revocation procedures." *Id.* Nowhere in the Statement of Basis and Purpose is there any mention about crime and safety. Although consistency, fairness, efficiency and convenience are certainly noble qualities for a polity, they do not rise to the level of a compelling state interest and fail to support Defendants' argument that the challenged rule is vital to public safety.[10]

Even assuming that the actual purpose of the regulation was public safety, Defendants fail to establish how the subject regulation is both justified by and narrowly tailored to meet that alleged safety interest. Defendants assert that a danger exists because Plaintiffs will not place their firearms in locked containers, as required by law, unless and until they are confronted with an imminent police encounter. *See* Declaration of Andrew Lunetta, ¶ 3. Defendants also claim a danger exists

---

[10]    It is well established that administrative convenience is not a compelling state interest. *See, e.g., Memorial Hospital v. Maricopa County*, 415 U.S. 250 (1974); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632 (1974); *Frontiero v. Richardson*, 411 U.S. 677 (1973); *Stanley v. Illinois*, 405 U.S. 645 (1972); *Shapiro v. Thompson*, 394 U.S. 618 (1969).

that the firearm will be readily accessible when a traveling holder of a restricted premises license becomes involved in certain "stress-inducing situations."  Declaration of Andrew Lunetta, ¶ 4.  In addition, they further contend that it would be more difficult to determine whether people transporting firearms are doing so legally if they were allowed to do so throughout the state and to other states than it is when they are limited under the current regulation.  Declaration of Andrew Lunetta, ¶¶ 6-7.

The fears recited by Defendants exist under the current licensing scheme and are in no way ameliorated by 38 RCNY § 5-23.  Setting aside Defendants' repugnant and unjustified assumption that licensees will break the law, Defendants have not shown that an individual traveling to an authorized arms range in the city or an authorized hunting location throughout the state is any less likely either to skirt the regulations for transportation of firearms or to be involved in a stress-inducing situation than somebody who is traveling to a second home or an arms range outside of New York City.  Fears that a narrowly-drawn regulation will be violated or more difficult to enforce do not give substantial justification to restrict fundamental rights.  *See McCullen v. Coakley*, 2014 U.S. LEXIS 4499, at *53 (U.S. Sup. Ct. June 26, 2014) (holding that statute creating a fixed buffer zone around abortion clinics violated First Amendment by restricting more speech than was necessary, notwithstanding the fact that they were easier to enforce than other alternatives; stating that "to meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier.")

Admittedly, it is easier for the NYCPD to bring a proceeding to punish a violation of a firearm transportation regulation when the violation occurs in New York City.  This fact alone, however, does not give credibility to Defendants' grim prognostication that if individuals such as

Plaintiffs are allowed to travel with their firearms outside of the city for limited purposes that the rule will somehow become meaningless. See Defendants' Memorandum of Law, p. 15. This is simply not the case. First, a licensee's assertion that he or she is going to or from a second home could be tested based on the location of the person and the location of the two homes. In determining whether the person was using a direct route, Defendants presumably would conduct the same type of investigation that they currently use if a licensee claims to be going to a designated hunting area. Second, if a person said they were going to or from a shooting competition, it would be very easy to verify both the existence of the competition and the person's participation in it. Third, if a licensee said that he or she was going to or from a target range or shooting competition, a determination as to the truth or falsity of this statement could be ascertained by evidence such as the location of the target range or competition to which the person was allegedly traveling, the location where he or she was stopped, the time at which he or she was stopped, whether the person has any evidence from the range or competition that he or she was actually there, any evidence concerning the person's route of travel (such as any toll tickets or EZ-Pass transponder data), any evidence concerning the work schedule of the person, any credit card receipts that would indicate purchases made outside of the path of travel between the person's house and the target range or shooting competition, and any evidence from any other persons with whom the individual is traveling.

Mr. Colantone's situation bears out this fact. He lives in Staten Island, and sought permission to take his firearm to a shooting competition in Old Bridge, New Jersey, approximately 20 miles away.[11] He would travel further to go to certain parts of the Bronx and Queens. He could travel hundreds of miles further still to go to an authorized area designated by the New York State

---

[11] Defendants go to great lengths to discuss the safety measures that New York City requires to become an authorized small arms range. *See* Declaration of Andrew Lunetta, ¶¶ 32-38. The implication is that somehow New York City gun ranges are safer than ranges outside of New York City. However, Defendants provide no evidence that bears out that arms ranges in New York City are inherently safer than their non-city counterparts.

Fish and Wildlife Law, resulting in significantly more time that the firearm would be removed from the premises (and significantly more permutations of routes that could be traveled with the firearm) than if the relief sought by Plaintiffs was granted.

Defendants would have this Court believe that if premises residence licensees were allowed to travel beyond New York City that officers would spend countless hours poring over maps and analyzing GPS data to try to determine whether an individual was really going to an authorized location. In reality, the officers would be using the same techniques that they use now to determine if somebody is acting outside the scope of his or her license. Given that a licensing officer's determination to revoke a handgun license is only reversed if it is done arbitrarily and capriciously or as an abuse of discretion, see, e.g, *Sewell v. New York*, 182 A.D.2d 469, 473 (1st Dept. 1992),[12] it is likely that people who the NYCPD believes are exceeding the scope of their license outside New York City will suffer a fate similar to those who are exceeding the scope of their license outside New York City. More importantly, fears about compliance with the licensing scheme and difficulty of adjudication are not substantial reasons for an extraterritorial regulation limiting the fundamental right to keep and bear arms in one's home in the manner done by the regulation.

Furthermore, the regulation is far from the least restrictive means possible to advance the stated goal of public safety. There is a litany of other less constitutionally suspect ways in which Defendants may be able to achieve the same goals; Congress's choice for addressing matter—FOPA—is a prime example. Even the controls by which Defendants regulate travel to and from firearms ranges in the city are much less restrictive than a flat-out ban on transportation. But Defendants have adopted an almost complete bar on any travel with a firearm, even when it is directly and causally linked to the core Second Amendment right to keep and bear arms in one's home. The subject regulation does not serve a compelling state interest, is not narrowly tailored to

---

[12] Plaintiffs do not address the issue of whether this standard remains appropriate in light of *Heller* and *McDonald*.

serve the interest which it purports to serve, and far from the least restrictive means. It fails every aspect of strict scrutiny analysis.

38 RCNY § 5-23 fails intermediate scrutiny for the same reasons.[13] Under that test, a regulation "passes constitutional muster only if it is substantially related to the achievement of an important governmental interest." *Kachalsky*, 701 F.3d at 96. As mentioned previously, the only conceivable interests that the City could cite in support of 38 RCNY § 5-23 are its "interests in public safety and crime prevention." *Id.* at 97. For the many reasons stated above, the restrictions at issue here are not substantially related to the achievement of those interests. There has been no evidence put forth that an overly-restrictive regulation that prevents licensed firearm owners from safely transporting their firearms under specified conditions appreciably fosters increased public safety or reduces crime. On the contrary, 38 RCNY § 5-23 critically <u>undermines</u> public safety by either foreclosing the use by a licensee of his or her handgun for self-protection in a resident's second home outside of the city or requiring that a licensee leave firearms in a vacant residence for possibly months at a time. Having licensed handgun owners without means to protect themselves, their families, and their property in their homes hardly serves the government's (or anyone else's) interests. The same holds true for having licensed handgun owners who lack access to the resources necessary to hone their skills. In addition to not achieving the stated interests, the regulation is not narrowly tailored to satisfy even intermediate scrutiny. Defendants may believe a narrower regulation will be disregarded, but that does not allow them to adopt a rule that deprives substantially more rights than necessary to accomplish the interest that the rule claims to further.

Under either standard of heightened scrutiny, 38 RCNY § 5-23 fails constitutional muster. It violates the Second Amendment as interpreted by the Supreme Court, and should be found

---

[13]     *Heller* and *McDonald* make clear that some form of heightened scrutiny is required. *See Heller*, 554 U.S. at 628 (rejecting rational basis review).

unconstitutional.

    **C. New York City's Restrictions On Target Practice And Competitive Shooting Violate Plaintiffs' Constitutional Right To Travel And The Firearms Owners Protection Act.**

New York City's harsh restrictions upon where a licensee can take his handgun also runs afoul of the fundamental constitutional right to travel—both inside one's state and across state borders—and federal law expressly permitting the transportation of firearms between jurisdictions.

The fundamental constitutional right to travel finds its origin in both the Privileges and Immunities Clause of Article IV, § 2 of the U.S. Constitution, and the Privileges and Immunities and Equal Protection clauses of the Fourteenth Amendment to the U.S. Constitution. This right "protects the right of a citizen of one State to enter and to leave another State." *Saenz v. Roe*, 526 U.S. 489, 500 (1999); *see United States v. Guest,* 383 U.S. 745 (1966); *Edwards v. California,* 314 U.S. 160 (1941). More than this, pursuant to Article IV, § 2, "a citizen of one State who travels in other States, intending to return home at the end of his journey, is entitled to enjoy the 'Privileges and Immunities of Citizens in the several States' that he visits." *Saenz*, 526 U.S. at 501. Defendants concede that the right to travel applies to intrastate travel as well as interstate travel. *See* Defendants' Memorandum of Law, p. 18.

The Supreme Court has held that the right to travel embraces at least three different components: (1) the right of a citizen of one State to enter and to leave another State; (2) the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and (3) for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State. *Saenz v. Roe*, 526 U.S. 489, 500 (1999). A law "implicates the right to travel when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right." *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (internal quotation marks and citations omitted). 38

RCNY § 5-23 is invalid because it fails all three of those grounds.

In the present case, the uncontroverted evidence establishes that the challenged rule actually deters Plaintiffs from traveling and spending time outside of New York City. Colantone Aff. (Docket No. 10-1), ¶ 12-14; Irizarry Aff. (Docket No. 10-2), ¶ 9-10; Alvarez Aff. (Docket No. 10-3), ¶ 9-10. All the Plaintiffs have stated that they would travel to various target shooting competitions but for the strict limitations of 38 RCNY § 5-23. *See Id*. Significantly, the regulation does not impose a minor condition on travel. It places Plaintiffs in a situation where they can choose which constitutional right they would rather be able to exercise: their right to travel or their right to keep and bear arms. Moreover, if Plaintiffs attempt to exercise both of these rights at the same time, by, for example, traveling to a gun range outside of the state, they run the risk of having their licenses revoked, which would completely deprive them of their Second Amendment rights.[14]

By effectively limiting handgun licensees in New York City to traveling *sans* their constitutional rights, 38 RCNY § 5-23 clearly impinges on City residents' fundamental right to travel. Because of the restrictions that regulation imposes, City residents cannot transport their firearms to other States where those firearms may be lawfully used or to other parts of New York State where opportunities for target practice and competitive shooting are legal and more readily and more economically available. 38 RCNY § 5-23 is the only thing standing between plaintiffs and participation in a shooting competition in New Jersey, target practice at a licensed shooting range in Yonkers or traveling to a second residence with their licensed firearm in furtherance of their Second Amendment Rights. In short, the exercise of both rights (to travel and to bear arms) may result in punishment. Under any understanding of the facts in this case, the right to travel is implicated.

---

[14] It is well-established "that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution." *Harman v. Forssenius*, 380 U.S. 528, 540 (1965) (citation omitted); accord *Dunn v. Blumstein*, 405 U.S. 330, 340-41 (1972). "Constitutional rights would be of little value if they could be … indirectly denied, or manipulated out of existence." *Harman*, 380 U.S. at 540 (internal quotation marks and citations omitted).

Restrictions on the fundamental right to intrastate and interstate travel are unconstitutional "unless shown to be necessary to promote a compelling governmental interest." *King v. New Rochelle Municipal Housing Authority*, 442 F.2d 646, 648 (2d Cir. 1971) (quoting *Shapiro v. Thompson*, 394 U.S. 618, 634 (1969)). New York City lacks the necessary compelling interest in limiting such travel. Other States and other parts of New York State <u>may</u> have an interest in keeping licensees from other jurisdictions from practicing and competing in their firing ranges, but this interest would not be sufficiently compelling to justify restricting the fundamental right to travel, and would certainly not be an interest shared by New York City. Moreover, even if New York City could somehow articulate a compelling interest in limiting interstate and intrastate travel with a licensed firearm, the draconian regulation that is the subject of this proceeding is far from the least restrictive means of promoting that interest.

Defendants analogize section 5-23 to a minor restriction on travel, such as a requirement to pay tolls to use public highways or a requirement to obtain permits to perform street music. Defendants' Memorandum of Law, p. 19. This characterization misses the essence of the Plaintiffs' argument. This regulation places a licensee in the situation where he or she must either limit his or her right to travel or limit his or her Second Amendment right to protect a second home or to increase his or her proficiency in the use of arms. Having to choose between one constitutional right and another is a much more significant restriction of rights than a toll or other "minor restriction." Contrary to Defendants' assertion, this restriction significantly deters travel by requiring licensees to check their constitutional rights at the doors of their houses. Because there is no compelling state interest to support this restriction on the right to travel created by 38 RCNY § 5-23, it is unconstitutional.

Even if this Court does not find that 38 RCNY § 5-23 offends the constitutionally protected

right to travel, it unequivocally denies plaintiffs the federal rights set forth in the Firearm Owners

Protection Act ("FOPA"), 18 U.S.C. § 926A.  FOPA provides:

> Notwithstanding any other provision of any law or any rule or regulation of a
> State or any political subdivision thereof, any person who is not otherwise
> prohibited by this chapter from transporting, shipping, or receiving a firearm shall
> be entitled to transport a firearm for any lawful purpose from any place where he
> may lawfully possess and carry such firearm to any other place where he may
> lawfully possess and carry such firearm if, during such transportation the firearm
> is unloaded, and neither the firearm nor any ammunition being transported is
> readily accessible or is directly accessible from the passenger compartment of
> such transporting vehicle . . . .[15]

FOPA specifically authorizes individuals to take a firearm from one location where they are

authorized to possess it to a second location where they are authorized to possess  it.  The plain

language of FOPA allows an individual with a premises residence license to transport their firearm

from the licensed residence to another location either in state or out of state where they are

authorized to possess the firearm.  In this manner, *Osterweil* and FOPA work in conjunction with

each other.  *Osterweil* allows a New York City resident to obtain a license in a jurisdiction outside of

New York City, and FOPA allows that person to legally transport a firearm between licensed places.

To the extent that 38 RCNY § 5-23 is construed to prohibit the transport of a firearm between two

authorized places, the regulation violates FOPA and must be invalidated.

The cases cited by Defendants in opposition to this position are inapposite.  *Toracco v. Port*

*Auth. of N.Y. & N.J.*, 615 F.3d 129 (2d Cir. 2010) stands for the proposition that FOPA does not

---

[15]    Notably, a prior version of the statute contained a specific requirement in the text of the statute itself that it be
limited only to interstate commerce:

> Any person not prohibited by this chapter from transporting, shipping, or receiving a firearm shall be
> entitled to transport an unloaded, not readily accessible firearm in interstate commerce
> notwithstanding any provision of any legislation enacted, or any rule or regulation prescribed by any
> State or political subdivision thereof.

The current version of the statute eliminates the specific interstate commerce requirement, substituting instead the
requirement that the firearm be transported from "any place" to "any other place."  Thus, it textually would apply to
transportation of a licensed firearm from New York City to other parts of New York State.

allow a presumption that gun owners may travel interstate with guns to places that do not permit unlicensed firearm possession. However, Plaintiffs are not attempting to travel to anyplace where they are not permitted to possess their firearms. Rather, Plaintiffs' position is that they are licensed to possess their firearms at their residences in New York City within the meaning of the statute. A second residence in New York where a plaintiff is licensed to possess a firearm or a shooting range where a plaintiff is legally permitted to use his or her firearms both constitute "any other place" where Plaintiffs may lawfully possess such firearm. Thus, the statute shields Plaintiffs (and other New York residents) from any repercussions for traveling between those two places.

In attempting to avoid the mandate of FOPA, Defendants point to *Beach v. Kelly*, 52 A.D.3d 436, 437 (1st Dep't 2008). As a state decision interpreting a federal statute, *Beach* is not binding upon this Court. Moreover, *Beach* was decided the same day as *Heller* and two years before *McDonald* and reflects an understanding of gun possession that is not consistent with those decisions. For these reasons, the Court should disregard Beach and find that 38 RCNY § 5-23 violates FOPA.

### D. New York City's Restrictions On Target Practice And Competitive Shooting Infringe Plaintiffs' First Amendment Rights.

New York City's restrictions on target practice and competitive shooting also violate plaintiffs' First Amendment rights. By prohibiting New York City residents from practicing at ranges and participating in shooting competitions outside City boundaries, 38 RCNY § 5-23 infringes plaintiffs' freedom of association and freedom of speech.

Gun ranges and recreational and competitive shooting events open to the public exist in every American state. 38 RCNY § 5-23 makes it impossible for New York City handgun licensees to participate in these competitions outside of New York City in abrogation of plaintiffs' First Amendment freedom of association. Like the right to bear arms, "the right of peaceable assembly

was considered by the Framers of our Constitution to lie at the foundation of [our] government." *Bates v. City of Little Rock*, 361 U.S. 516, 522-23 (1960). Thus, the "freedom of association" is "protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Id.* at 523; *see Grosjean v. American Press Co.*, 297 U.S. 233 (1936); *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105 (1943).

When faced with a "violation of the right to associate," "a court must consider the 'character and magnitude' of the alleged injury the plaintiff has sustained, and then must identify and evaluate the interests [that arguably] . . . justify the burdens imposed by the challenged rule, taking into consideration the extent to which the state's interests make it necessary to burden plaintiff's rights." *Green Party of New York State v. New York State Bd. of Elections*, 389 F.3d 411, 419 (2d Cir. 2004) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). "If those rights are subject to severe restriction, the regulation has to be narrowly drawn to advance a compelling state interest." *Id.* If the law imposes only "'reasonable, nondiscriminatory restrictions,'" then important regulatory interests are sufficient to justify those restrictions. *Id.* (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 788 (1983)).

The restriction on plaintiffs' freedom of association is severe. New York City residents are forbidden from participating in competitive shooting events outside New York City borders. In point of fact, they are effectively prohibited from doing so anywhere given that such events do not regularly take place at the only range available to the public. Indeed, the only way 38 RCNY § 5-23's restriction on the freedom of association could be more severe would be if it expressly prohibited participation in recreational and competitive shooting events altogether. But there is no real difference between this hypothetical and the way New York City's prohibition operates in fact.

What is more, New York City residents who want to comply with 38 RCNY § 5-23 but

participate in competitive shooting events are effectively coerced into joining private clubs that they may prefer not to join. As the one restricted public range does not offer such competitions,[16] the only option left to New York City residents is private clubs located within the City. This coercion also infringes plaintiffs' First Amendment rights. Just as the First Amendment prevents the government from substantially burdening speech, it also prevents the government from compelling individuals to speak or associate against their will. *See United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977); *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943); *Abood v. Detroit Bd. of Ed.*, 431 U.S. 209 (1977); *Keller v. State Bar of Cal.*, 496 U.S. 1 (1990). The forced association imposed by 38 RCNY § 5-23 further underscores the First Amendment problems the regulation engenders.

Were this not enough, 38 RCNY § 5-23 runs afoul of the First Amendment in yet another way. The First Amendment protects a right to teach, learn, and convey information. *See, e.g.*, *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) (First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom"); *Sweezy v. New Hampshire*, 354 U.S. 234, 249-50 (1957) (plurality) ("right to lecture . . . could not be seriously debated," and noting that "teachers and students must always remain free to inquire, to study and to evaluate, and to gain new maturity and understanding"); *Universal City Studios v. Corley*, 273 F.3d 429, 446 (2d Cir. 2001) ("Even dry information, devoid of advocacy, political relevance, or artistic expression, has been accorded First Amendment protection."). This right is inextricably intertwined with the right to bear arms. As *Heller* noted, there is "'[n]o doubt[] a citizen who keeps a gun or pistol under judicious precautions,

---

[16] Defendants disagree with Plaintiff's assertion that only one public range exists for which membership is not required, arguing that seven of the eight NYPD approved small arms ranges (not including police or military ranges) are "available to anyone possessing a valid license or permit." Declaration of Andrew Lunetta, ¶ 40. However, they then assert that "six public ranges <u>ask</u> for membership, but are fully available for any member of the public to join, if they pay the membership fee (much like a membership in a health club/gym." *Id.* (our emphasis). Once the six arms ranges that require membership are removed from the seven publicly available ranges, there remains one arms range that is available to the public which does not require membership, *id.*, further validating Plaintiff's assertion.

practices in safe places the use of it, *and in due time teaches his sons to do the same*, exercises his individual right.'" *Heller*, 554 U.S. at 619 (emphasis added). By eliminating the vast majority of options for New York City residents to teach and learn safe and effective handgun practices, 38 RCNY § 5-23 substantially burdens plaintiffs' First Amendment rights.[17]

**E. New York City's Restrictions On Target Practice And Competitive Shooting Violate The Dormant Commerce Clause.**

Finally, 38 RCNY § 5-23 runs afoul of the U.S. Constitution's Commerce Clause. The Commerce Clause provides that "[t]he Congress shall have Power . . . [t]o regulate Commerce among the several States." U.S. Const. art. I, § 8, cl. 3. "Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of commerce." *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*, 511 U.S. 93, 98 (1994). As relevant here, "[a] statute or regulation may violate the" negative—or dormant— Commerce Clause if it "'has the practical effect of "extraterritorial" control of commerce occurring entirely outside the boundaries of the state in question" or "imposes a burden on interstate commerce incommensurate with the local benefits" secured. *Selevan v. New York Thruway Auth.*, 584 F.3d 82, 90 (2d Cir. 2009) (quoting *Freedom Holdings Inc. v. Spitzer,* 357 F.3d 205, 216 (2d Cir. 2004)). The Dormant Commerce Clause applies to municipal regulations as well as state statutes. *See, e.g., Dean Milk Co. v. City of Madison*, 340 U.S. 349, 356, 95 L. Ed. 329, 71 S. Ct. 295 (1951) (striking down ordinance requiring all milk sold in city to be pasteurized within five-mile radius of city limits).

In determining whether a local regulation violates the dormant Commerce Clause, a two-tiered approach is used. A local regulation that discriminates against interstate commerce on its face

---

[17] As already discussed in the Second Amendment context, there is no compelling or important interest served by limiting the availability of licensed New York City residents to practice the safe and effective use of their handguns. *See supra*. Even if there were, 38 RCNY § 5-23 is not narrowly drawn or reasonably constructed to achieve that interest.

or in practical effect is unconstitutional unless the enacting municipality can establish that a legitimate local interest cannot be served by reasonable non-discriminatory alternatives. See *Dept. of Revenue of Ky. v. Davis*, 553 U.S. 328, 338-39 (2008); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986).  Once a plaintiff meets its initial burden of showing discrimination, the burden shifts to the government to justify the discriminatory law. See *Island Silver & Spice, Inc. v. Islamorada*, 475 F.Supp.2d 1281, 1289 (S.D.Fla. 2007) (internal citations omitted), aff'd 542 F.3d 844 (11th Cir. 2008).

Discrimination, in the context of the Dormant Commerce Clause, "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.,* 511 U.S. 93, 99 (1994). State statutes that directly discriminate against interstate commerce, or whose effects favor in-state economic interests at the expense of out-of-staters, are routinely struck down, see, e.g., *New Energy Co. v. Limbach*, 486 U.S. 269 (1988); *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941 (1982); *Lewis v. BT Investment Managers, Inc.*, 447 U.S. 27 (1980).  If a plaintiff cannot establish such discrimination, then it must demonstrate that the facially nondiscriminatory regulation's burden on interstate commerce "clearly exceeds" the putative local benefits. This is the so-called "undue burden" test. See *Davis*, 553 U.S. at 338-39; *Brown-Forman*, 476 U.S. at 578-79 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970)).  The U.S. Supreme Court has suggested that as long as all out-of-state companies are excluded or affected and at least one local company is favored, there is discrimination against interstate commerce, triggering heightened scrutiny. *C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 392 (1994).[18]

---

[18]  Judge Jones noted, "While no clear rule exists to tell us when to apply the stricter rule of invalidity, . . . a finding economic protectionism can be based solely upon a statute's discriminatory effect." Id. She further concluded that while protectionism may not be evident in the legislature's intent, if it is evident in the statute or regulations's effect, the favoritism for in-state interests "cannot be ignored as incidental." Id.

The basis for a finding of discrimination is that such laws leave "no room for investment from outside." See *Id*. at 392.

New York City's restrictions on target practice and competitive shooting for its residents clearly discriminate against non-New York City interests. The regulation sets forth a *de facto* monopoly for in-city target ranges to the exclusion of all out-of-city ranges to handle all target shooting for residents with a premises license. Because the regulation is clearly discriminatory, it may be enforced only if a legitimate local interest cannot be served by reasonable non-discriminatory alternatives. Defendants cannot meet this burden, as there are numerous non-discriminatory ways in which the city could accomplish its serve its interest of having its residents practice shooting in a safe facility.

Even if 38 RCNY § 5-23 is found not to be discriminatory on its face or application, the regulation should still be found unconstitutional as the burden on interstate commerce is clearly excessive in relation to the putative local benefits. Prohibiting New York City residents from frequenting non-City ranges or participating in non-City competitions clearly burdens interstate commerce. Just as the ordinance in *Dean Milk Co.* requiring all milk sold in city to be pasteurized within a five-mile radius of city limits discriminated against milk produced outside the city of Madison, the regulation at issue in this case discriminates against non-New York City gun range operators by forbidding City residents utilizing these ranges. This burden on interstate commerce is significant when compared to the local benefit, which is none. Restricting New York City residents to City ranges does nothing to promote proficiency in the use of firearms, enhance awareness of firearms safety principles, or encourage the safe and responsible use of firearms. There is no reason to believe that the gun ranges within New York City borders are safer than the facilities of gun ranges that exist outside those borders. Similarly, there is no support for the contention that safety

training principles utilized by City gun ranges are so advanced and/or unique that (when compared to those utilized by non-City ranges) requiring a resident to practice firearms safety at a New York City range produces greater firearms proficiency and/or greater awareness of firearms safety in residents. And any argument that requiring New York City residents to use only New York City ranges has reduced (or even impacted) the incidence of intentional or accidental gun violence within City borders is meritless.

The regulation further attempts to exert extraterritorial control of commerce outside the boundaries of the City. In enacting and enforcing 38 RCNY § 5-23 New York City seeks to regulate and control an activity that takes place wholly outside of the borders of New York City and New York State: attendance at non-City approved gun ranges and participation in competitive shooting events beyond the City's borders. Ranges that operate beyond New York City borders welcome City residents who are lawfully licensed to possess firearms. The sponsors of competitive shooting events that occur in other states do the same. The issues of whether a New York City resident who is legally permitted to possess a firearm in the City can practice target shooting at a Yonkers gun range or can attend a competitive shooting event in Old Bridge, New Jersey are properly resolved by the local legislatures of Yonkers or Old Bridge, or the state legislature of New Jersey. The City of New York has no say in such matters.

The Dormant Commerce Clause problem with 38 RCNY § 5-23 would be obvious if the restriction were imposed on surfboards or steamboats. *Cf. Gibbons v. Ogden*, 22 U.S. 1, 27 (1824) (An individual could not be deprived of his "right to go from New-Jersey to New-York, in a vessel, owned by himself, of the proper legal description, and enrolled and licensed according to law."). But New York City can no more limit its residents licensed to use handguns to practice only in New York City, than it could tell its residents that they can own surfboards, but only if they do not use

them on New Jersey beaches.

**CONCLUSION**

In summary, 38 RCNY § 5-23 violates the Second Amendment, the constitutional right to travel, the Firearm Owners Protection Act, the First Amendment rights to freedom of association and freedom of speech and the dormant Commerce Clause of the U.S. Constitution.  This Court should issue a summary judgment pursuant to Fed. R. Civ. P. 56 for an Order:  (1) granting declaratory judgment that 38 RCNY § 5-23 is unconstitutional on the above grounds; and (2) permanently enjoining the implementation and enforcement of 38 RCNY § 5-23 by the New York City Police Department in any manner that prohibits or precludes the plaintiffs from traveling beyond either the borders of New York City or New York State with a licensed handgun to either travel to a second home or to attend a shooting range or competition.

Dated: July 14, 2014

Respectfully Submitted,

**GOLDBERG SEGALLA, LLP**
By:   /s/   Brian T. Stapleton
Brian T. Stapleton, Esq. (BS 5640)
Christopher Bopst, Esq.
11 Martine Avenue, Suite 750
White Plains, New York 10606-1934
(914) 798-5400
bstapleton@goldbergsegalla.com
***Counsel For Plaintiffs***